**BURSOR & FISHER, P.A.**
Neal J. Deckant (State Bar No. 322946)
Julia K. Venditti (State Bar No. 332688)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
Email: ndeckant@bursor.com
          jvenditti@bursor.com

**BURSOR & FISHER, P.A.**
Frederick J. Klorczyk III (State Bar No. 320783)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: fklorczyk@bursor.com

*Attorneys for Plaintiff and the Putative Class*

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| GREGORY KRIKORIAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIMPLISAFE, INC.,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) UNFAIR COMPETITION<br>(2) CONVERSION<br>(3) FALSE ADVERTISING<br>(4) VIOLATION OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT<br>(5) UNJUST ENRICHMENT / RESTITUTION<br>(6) NEGLIGENT MISREPRESENTATION<br>(7) FRAUD<br><br>**DEMAND FOR JURY TRIAL** |

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Gregory Krikorian ("Plaintiff") brings this action on behalf of himself and all others similarly situated against SimpliSafe, Inc. ("SimpliSafe" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## INTRODUCTION

1.      This is a putative class action lawsuit against Defendant for engaging in an illegal "automatic renewal" scheme with respect to its subscription plans for SimpliSafe-branded products and services that are available exclusively to consumers who enroll in Defendant's auto-renewal membership programs (collectively, the "SimpliSafe Subscriptions" or "Monitoring Service Plans," described below) through its website at https://www.simplisafe.com (the "SimpliSafe Website") or its mobile applications (the "SimpliSafe Apps") (collectively, the "SimpliSafe Platform").  Defendant is an American home security company that produces and sells self-installed (or Pro-installed[1]) wireless security systems that include products such as cameras, motion sensors, video doorbells, and others.  For a monthly fee, consumers can utilize Defendant's monitoring services in conjunction with their purchased security systems, which consist of 24/7 home monitoring, instant alarm response, and faster police response (the "Monitoring Plan Features," described in further detail below).  Relevant to Plaintiff's allegations, when consumers sign up for the SimpliSafe Subscriptions, Defendant actually enrolls consumers in a program that automatically renews the SimpliSafe Subscriptions from month-to-month and results in monthly charges to the consumer's credit card, debit card, or third-party payment account ("Payment Method").  In doing so, Defendant fails to provide the requisite disclosures and authorizations required to be made to California consumers under California's Automatic Renewal Law ("ARL"), Cal. Bus. Prof. Code §§ 17600, *et seq*.

---

[1] SimpliSafe-approved technicians are available to help customers set up new systems, demonstrate how to use key features, and answer questions.  This "Pro setup" can be selected by the customer at checkout and starts at an added fee of $99.99.  *See* https://simplisafe.com/.

2.      Through the SimpliSafe Platform, Defendant markets, advertises, and sells to consumers in California and throughout the United States paid memberships to the SimpliSafe Subscriptions, which provide consumers with access to various products, benefits, and features that are only available to paid subscribers.  Specifically, Defendant offers the following fee-based automatic renewal membership plans: Self Monitoring with Camera Recordings, Standard Monitoring, and Interactive Monitoring (collectively, the "SimpliSafe Subscriptions").  Defendant offers the ***Self Monitoring with Camera Recordings*** plan for $0.33 cents per day ($9.99 per month), which provides customers with unlimited camera recordings (for up to 5 cameras), alerts for every sensor in the customer's security system, HD live view on all cameras, and up to a one-year total warranty.  Defendant offers the ***Standard Monitoring*** plan for $0.66 cents per day ($17.99 per month), which provides customers with 24/7 priority police dispatch, 24/7 fire department dispatch, 24/7 ambulance dispatch, HD live view on all cameras in the customer's security system, and up to a 1 year total warranty.  Finally, Defendant offers the ***Interactive Monitoring*** plan for $0.99 cents per day ($27.99 per month), which provides 24/7 police, fire, and medical dispatch, unlimited camera recording (for up to 10 cameras), the ability to confirm or cancel alarms in seconds with alarm texts, video verification (the SimpliSafe team confirms that the threat to the customer's home is legitimate and collects evidence related to the incident to provide to police), 24/7 flood and extreme temperature monitoring, a 10% discount on future add-on SimpliSafe devices, and a subscription lifetime warranty.[2]

3.      Consumers can sign up for Defendant's SimpliSafe Subscriptions through either the SimpliSafe Website or the SimpliSafe Apps.  To do so, customers provide Defendant with their billing information, and Defendant then automatically charges its customers' Payment Method as

---

[2] While Defendant displays a comparison chart of the SimpliSafe Subscriptions in a support article on its website, *see* https://support.simplisafe.com/articles/alarm-events-monitoring/what-are-the-service-plan-options/6344794a013ba90af0bce6a4?lang=en_US, the monthly fees for the Standard Monitoring and Interactive Monitoring plans cost an additional $2.00 when added to a customer's virtual shopping cart on the website.  Thus, while advertised at $17.99 per month and $27.99 per month, respectively, consumers are shown higher prices at checkout ($19.99 per month and $29.99 per month, respectively).  Additionally, Defendant does not obviously market the monthly rates of its Subscriptions, instead opting to show the nominal daily rates consumers are subjected to but will not be reflected in Defendant's charges to their Payment Methods.

payments are due on a monthly basis.  Defendant is then able to unilaterally charge its customers renewal fees without their consent, as it is in possession of its customers' Payment Information. Thus, Defendant has made the deliberate decision to charge Plaintiff and other similarly situated customers on a monthly or yearly basis, absent their consent under the ARL, relying on consumer confusion and inertia to retain customers, combat consumer churn, and bolster its revenues.

4.      Pursuant to the ARL, online retailers who offer automatically renewing subscriptions to California consumers must: (i) provide the complete automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent prior to the purchase, *see* Cal. Bus. Prof. Code § 17602(a)(1); (ii) obtain consumers' affirmative consent prior to charging their Payment Methods in connection with the subscriptions, *see id*. § 17602(a)(2); and (iii) provide an acknowledgment that includes the automatic renewal offer terms and identifies a cost-effective, timely, and easy-to-use mechanism for consumers to cancel their subscriptions, *see id*. §§ 17602(a)(3), 17602(c).

5.      Consumers purchasing the SimpliSafe Subscriptions do so by choosing a free trial that automatically renews with a paid subscription at the end of the trial period, or a paid monthly or annual subscription (at either the full standard recurring rate that Defendant ordinarily charges or at a promotional or discounted rate that remains static for a limited period of time and then automatically renews to the full standard rate).  As will be discussed below, the enrollment process for a SimpliSafe Subscription on the SimpliSafe Platform uniformly violates each of the core requirements of the ARL.  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their SimpliSafe Subscriptions.

6.      Specifically, Defendant systematically violates the ARL by: (i) failing to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement is fulfilled, in violation of Section 17602(a)(1); (ii) charging consumers' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Section 17602(a)(2); and (iii) failing to provide an acknowledgment that includes the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in

a manner that is capable of being retained by the consumer, in direct violation of Section 17602(a)(3).  The acknowledgment also fails to disclose a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their SimpliSafe Subscriptions, in violation of Section 17602(c).

7.     As a result, pursuant to Section 17603, all goods, wares, merchandise, or products sent to Plaintiff and the Class under the automatic renewal of continuous service agreements are deemed to be "unconditional gifts" under the ARL.

8.     For the foregoing reasons, Plaintiff brings this action individually and on behalf of all California purchasers of any of Defendant's SimpliSafe Subscriptions from the SimpliSafe Platform who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for the renewal of their SimpliSafe Subscriptions.  Based on Defendant's unlawful conduct, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs, for: (1) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (2) conversion; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; (4) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; (5) unjust enrichment / restitution; (6) negligent misrepresentation; and (7) fraud.

## THE PARTIES

9.     Plaintiff Gregory Krikorian is a citizen of California, residing in Auburn, California.

10.     Defendant SimpliSafe, Inc. ("SimpliSafe") is a Delaware corporation with its corporate headquarters and principal place of business at 100 Summer Street, Suite 300, Boston, Massachusetts, 02110.  Defendant is an American home security company that produces and sells wireless security systems that include products such as cameras, motion sensors, video doorbells, and others.  Relevant here, Defendant also offers access to certain exclusive SimpliSafe-branded monitoring services on a contract or fee basis to customers who enroll in the automatically renewing SimpliSafe Subscriptions.  Defendant wholly owns and operates the SimpliSafe

Subscriptions, which it markets to consumers through the SimpliSafe Platform.  Defendant is also responsible for the promotion, advertisement, marketing, and/or sale of the SimpliSafe Subscription programs, and it owns and operates the SimpliSafe Website and Apps, through which Defendant markets and sells the SimpliSafe Subscriptions.  Defendant sells – and, at all relevant times during the Class Period, sold – the SimpliSafe Subscriptions in California and has done business in and throughout California and the United States.  In connection with the SimpliSafe Subscriptions, Defendant has, at all relevant times, made (and continues to make) automatic renewal or continuous service offers to consumers in California and throughout the United States via the SimpliSafe Website and/or SimpliSafe Apps.

11.     Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class action where the aggregate claims for all members of the proposed class are in excess of $5,000,000.00, exclusive of interests and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, is a citizen of a state different from Defendant.

13.     This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a citizen of California, and submits to the jurisdiction of the Court, and because Defendant has, at all times relevant hereto, systematically and continually conducted, and continues to conduct, business in California, including within this District.  Defendant therefore has sufficient minimum contacts with this state, including within this District and/or intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its products and/or services to residents within this District and throughout California.  Additionally, Defendant marketed and sold the SimpliSafe Subscription to Plaintiff in this District.

14.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.  Also, Plaintiff resides in this District and purchased Defendant's SimpliSafe Subscription in this District.  Moreover, Defendant systematically conducts business in this District and throughout the State of California, and it distributed, advertised, and sold the SimpliSafe Subscriptions to Plaintiff and Class Members in this State and District.

## FACTUAL BACKGROUND

### A.     Background On The Subscription e-Commerce Industry

15.     The e-commerce subscription model is a business model in which retailers provide ongoing goods or services "in exchange for regular payments from the customer."[3]  Subscription e-commerce services now target a wide range of customers and cater to a variety of specific interests.  Given the prevalence of online and e-commerce retailers, subscription e-commerce has grown rapidly in popularity in recent years.  Indeed, the "subscription economy has grown more than 400% over the last 8.5 years as consumers have demonstrated a growing preference for access to subscription services[.]"[4]  Analysts at UBS predict that the subscription economy will expand into a $1.5 trillion market by 2025, up from $650 billion in 2020.[5]  That constitutes an average annual growth rate of 18%, which makes the subscription economy "one of the fastest-growing industries globally."[6]

---

[3] Core DNA, *How to Run an eCommerce Subscription Service: The Ultimate Guide* (May 19, 2020), https://www.coredna.com/blogs/ecommerce-subscription-services.

[4] Business Insider, *Taco Bell's taco subscription is rolling out nationwide — here's how to get it* (Jan. 6, 2022), https://www.businessinsider.com/taco-bell-subscription-launching-across-the-country-2022-1 (internal quotation marks omitted).

[5] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html ("[A]t close to USD 650 billion in 2020, we expect the subscription economy to expand into a USD 1.5 trillion market by 2025, implying an average annual growth rate of 18%.").  *See also* Subscribed, *UBS Declares: It's Worth Investing in the Subscription Economy* (Apr. 17, 2021), https://www.subscribed.com/read/news-and-editorial/ubs-declares-its-worth-investing-in-the-subscription-economy; Business 2 Community, *The Subscription Economy Is Booming Right Now. But Are You Reaping the Full Benefits?* (Oct. 7, 2021), https://www.business2community.com/ecommerce/the-subscription-economy-is-booming-right-now-but-are-you-reaping-the-full-benefits-02434851.

[6] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), *supra* ("[Growth] was seen across many areas, including e-commerce, video streaming, gaming, cloud-based applications, etc."); *see also*

---

16.     SimpliSafe is an American company and home-security based platform that operates via Defendant's website, mobile application, and security system products.  The company was founded and incorporated in Delaware in August of 2006, and organized its headquarters in Boston, Massachusetts.  Defendant adopted the subscription model, placing its most-desired monitoring services behind an additional paywall with three versions of plans: Self-Monitoring, Standard, and Interactive.  Each plan provides subscribers with various perks (*see supra* ¶ 2), but only the Standard and Interactive plans provide the most sought-after services: 24/7 police, fire, and medical dispatch.  The Interactive Monitoring Plan features all the same perks and benefits as the other subscriptions, plus a ten percent discount on additional sensor purchases, a lifetime equipment warranty, and video verification.[7]

17.     The production, sale, and distribution of subscription-based products and services is a booming industry that has exploded in popularity over the past few years.  According to *Forbes*, "[t]he subscription e-commerce market has grown by more than 100% percent a year over the past five years, with the largest retailers generating more than $2.6B in sales in 2016, up from $57.0M in 2011."[8]  Following 2016, market growth within the industry increased exponentially, reaching $650 billion in 2020.[9]  "As such, the financials of companies with subscription business models[] … improved dramatically in 2020 thanks to limited revenue volatility and strong cash flow

---

Juniper Research, *Subscriptions For Physical Goods To Overtake Digital Subscriptions By 2025; Growing To Over $263bn Globally* (Oct. 12, 2020), https://www.juniperresearch.com/press/subscriptions-for-physical-goods-to-overtake (acknowledging "the significant lead the digital sector has had in th[e] area[ of digital service subscriptions]").

[7] SimpliSafe Support, *What are the service plan options?* https://support.simplisafe.com/articles/alarm-events-monitoring/what-are-the-service-plan-options/6344794a013ba90af0bce6a4.

[8] Forbes, *The State Of The Subscription Economy, 2018* (Mar. 4, 2018), https://www.forbes.com/sites/louiscolumbus/2018/03/04/the-state-of-the-subscription-economy-2018/#6ad8251a53ef.

[9] *See* UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

generation."[10]  Thus, "[t]he share prices of most subscription companies have performed well in recent years."[11]

18.     The expansion of the subscription e-commerce market shows no signs of slowing. "We're now in the subscriptions era, and the pandemic is accelerating its takeover.  During the COVID-19 lockdowns, many digital-based subscription business models fared well due to their promise of convenience and strong business continuity."[12]  According to *The Washington Post*, "[s]ubscriptions boomed during the coronavirus pandemic as Americans largely stuck in shutdown mode flocked to digital entertainment[.] … The subscription economy was on the rise before the pandemic, but its wider and deeper reach in nearly every industry is expected to last, even after the pandemic subsides in the United States."[13]

19.     However, as the *Washington Post* has noted, there are downsides associated with the subscription-based business model.[14]  While the subscription e-commerce market has low barriers and is thus easy to enter, it is considerably more difficult for retailers to dominate the market due to the "highly competitive prices and broad similarities among the leading players."[15]  In particular, retailers struggle with the fact that "[c]hurn rates are high, [] and consumers quickly cancel services that don't deliver superior end-to-end experiences."[16]  Yet, retailers have also recognized that, where the recurring nature of the service, billing practices, or cancellation process is unclear or

---

[10] *Id.*

[11] *Id.*

[12] UBS, *Investing in digital subscriptions* (Mar. 10, 2021), https://www.ubs.com/global/en/wealth-management/our-approach/marketnews/article.1525238.html.

[13] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ (noting that "e-commerce and entertainment subscriptions to sites such as Netflix, Hulu and Disney Plus made headlines during the pandemic for soaring growth").

[14] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[15] McKinsey & Company, *Thinking inside the subscription box: New research on e-commerce consumers* (Feb. 2018), https://www.mckinsey.com/industries/technology-media-and-telecommunications/our-insights/thinking-inside-the-subscription-box-new-research-on-ecommerce-consumers#0.

[16] *Id.*

complicated, "consumers may lose interest but be too harried to take the extra step of canceling their membership[s]."[17]  As these companies have realized, "[t]he real money is in the inertia."[18]  As a result, "[m]any e-commerce sites work with third-party vendors to implement more manipulative designs."[19]  That is, to facilitate consumer inertia, a number of subscription e-commerce companies, including Defendant, "are now taking advantage of subscriptions in order to trick users into signing up for expensive and recurring plans.  They do this by [among other things] intentionally confusing users with their [website or] app's design and flow, by making promises of 'free trials' that convert after only a matter of days, and other misleading tactics," such as failure to fully disclose the terms of its automatic-renewal programs.[20]

20.     To make matters worse, once enrolled in the subscription, "[o]ne of the biggest complaints consumers have about brand/retailers is that it's often difficult to discontinue a subscription marketing plan."[21]  Moreover, "the rapid growth of subscriptions has created a host of challenges for the economy, far outpacing the government's ability to scrutinize aggressive marketing practices and ensure that consumers are being treated fairly, consumer advocates say."[22]  Thus, although "Federal Trade Commission regulators are looking at ways to make it harder for companies to trap consumers into monthly subscriptions that drain their bank accounts[ and]

---

[17] The Washington Post, *Little-box retailing: Subscription services offer new possibilities to consumers, major outlets* (Apr. 7, 2014), https://www.washingtonpost.com/business/economy/tktktktk/2014/04/07/f68135b6-a92b-11e3-8d62-419db477a0e6_story.html.

[18] *Id.*

[19] Business Insider, *A new study from Princeton reveals how shopping websites use 'dark patterns' to trick you into buying things you didn't actually want* (Jun. 25, 2019), https://www.businessinsider.com/dark-patterns-online-shopping-princeton-2019-6.

[20] TechCrunch, *Sneaky subscriptions are plaguing the App Store* (Oct. 15, 2018), https://techcrunch.com/2018/10/15/sneaky-subscriptions-are-plaguing-the-app-store/.

[21] The Washington Post, *Everything's becoming a subscription, and the pandemic is partly to blame* (June 1, 2021), https://www.washingtonpost.com/business/2021/06/01/subscription-boom-pandemic/ ("'Subscription services are a sneaky wallet drain,' said Angela Myers, 29, of Pittsburgh. 'You keep signing up for things and they make it really hard to cancel.'"); *see also* New Media and Marketing, *The problem with subscription marketing* (Mar. 17, 2019), https://www.newmediaandmarketing.com/the-problem-with-subscription-marketing/.

[22] *Id.*

---

attempting to respond to a proliferation of abuses by some companies over the past few years[,]"[23] widespread utilization of these misleading dark patterns and deliberate omissions persist.

21. Defendant has successfully implemented these tactics. Indeed, Defendant's recent growth in revenues and subscriber count with respect to its SimpliSafe Subscriptions coincides with a sharp decline in subscriber satisfaction, as the SimpliSafe Subscriptions and the Platform from which they operate have become riddled with "dark patterns." A dark pattern is "a user interface carefully crafted to trick users into doing things they might not otherwise do, such as … signing up for recurring bills."[24] Specifically, Defendant has been using various types of dark patterns, including but not limited to "roach motel,"[25] "misdirection,"[26] and "forced continuity,"[27] in order to prevent user unsubscription from the SimpliSafe Subscriptions by adopting complex cancellation procedures to increase the friction in the subscription cancellation process. Defendant's utilization of these dark patterns – especially in conjunction with its failure to fully disclose the terms of its automatic-renewal programs (discussed further below) – has led to a reduction in churn rates by making it next to impossible for subscribers to cancel their Athletic Subscriptions. It has further led to an increase in accidental or unintentional sign-ups by consumers for paid Athletic Subscription plans, in effect increasing subscriber count and, thus, Defendant's overall revenues from renewal fees.

---

[23] *Id.*

[24] UX Design, *Dark patterns in UX: how designers should be responsible for their actions* (Apr. 15, 2018), https://uxdesign.cc/dark-patterns-in-ux-design-7009a83b233c (quoting UX designer Harry Brignull (PhD Cognitive Science), who coined the term "Dark Patters" in August 2010).

[25] "Roach motel" refers to a "design [that] makes it very easy for [consumers] to get into a certain situation, but then makes it hard for [consumers] to get out of it (e.g. a subscription)." https://www.darkpatterns.org/types-of-dark-pattern/roach-motel.

[26] "Misdirection" is a type of dark pattern where a website's "design purposefully focuses [customers'] attention on one thing in order to distract [them] attention from another." In many cases, "[w]hat's deceptive is the way [the website] presents [purchase] options: it uses misdirection to hide what is actually happening[.]" https://www.darkpatterns.org/types-of-dark-pattern/misdirection.

[27] One example of "forced continuity," another type of dark pattern, is where customers' sign up for a "free trial with a service[ that] comes to an end and [their] credit card silently starts getting charged without any warning. [The subscriber is] are then not given an easy way to cancel the automatic renewal." https://www.darkpatterns.org/types-of-dark-pattern/forced-continuity.

**B.     California's Automatic Renewal Law**

22.    In 2010, the California Legislature enacted the Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq*., with the intent to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service."  Cal. Bus. & Prof. Code § 17600 (statement of legislative intent).  More recently, in 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online.  The California Legislature again amended the ARL in 2022, adding additional notice, disclosure, and cancellation requirements.  *See* Cal. Bus. & Prof. Code §§ 17602(a)(4)(A)-(E), 17602(b)(1)-(2), 17602(d)(1)-(3).

23.    The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following:"

> (1)  Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer.  If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial.

> (2)  Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time.

> (3)  Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer.  If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services.

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

24.     As of 2018, the updated ARL also requires that, prior to the completion of the initial order for the automatic renewal or continuous service, sellers must explain the price to be charged when the promotion or free trial ends.  *See* Cal. Bus. & Prof. Code § 17602(a)(1), *supra*.  If the initial offer is at a promotional price that is only for a limited time and will increase later, the seller must obtain consumer consent to the non-discounted price prior to billing.  *See id*.  Sellers must also notify consumers in the acknowledgment about how to cancel the free trial before they are charged.  *See* Cal. Bus. & Prof. Code § 17602(a)(3), *supra*.

25.     Section 17602(c) of the ARL further provides:

> A business that makes an automatic renewal offer or continuous service offer **shall provide a toll-free telephone number, electronic mail address**, a postal address if the seller directly bills the consumer, **or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation** that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a).

Cal. Bus. & Prof. Code § 17602(c) (emphasis added).

26.     Additionally, following the 2018 and 2022 amendments to the ARL, the updated law requires e-commerce sellers, doing business in California, to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online.  Specifically, Section 17602(d) provides:

> [A] business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service *exclusively online*, *at will*, *and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately*.

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).  The updated ARL further specifies that a seller who provides an automatic offer "shall provide a method of termination that is online in the form of either of the following: (A) A prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings[; or] (B) By an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information."  Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

27.     Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a).

28.     Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures:  (1) That the subscription or purchasing agreement will continue until the consumer cancels.  (2) The description of the cancellation policy that applies to the offer.  (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known.  (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer.  (5) The minimum purchase obligation, if any." Cal. Bus. & Prof. Code § 17601(b).

29.     Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbol ls or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

30.     Finally, Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or she sees fit without any obligation whatsoever on the consumer's part to the business[.]" Cal. Bus. & Prof. Code § 17603.

31.     As alleged below, Defendant's practices on the SimpliSafe Platform systematically violate Sections 17602(a)(l), 17602(a)(2), 17602(a)(3), 17602(c), and 17602(d) of the ARL.

**C.      Defendant's Business: The SimpliSafe Subscription Enrollment Process**

32.      At all relevant times, Defendant offered, via the SimpliSafe Website and Apps, various SimpliSafe Subscriptions for access to exclusive SimpliSafe-branded content, products, and/or services on a contract or fee basis.  The SimpliSafe Subscriptions are offered on a recurring basis for monthly or yearly renewal terms, and all plans automatically renew at the end of the defined renewal term unless the subscriber cancels.  For example, customers that sign up for a straight-to-paid *monthly* SimpliSafe Subscription are, at the end of the initial one-month period, automatically renewed and typically charged the full amount for the next month, and every month thereafter if they do not cancel.  Similarly, customers enrolled in a straight-to-paid *annual* SimpliSafe Subscription are, at the end of the initial one-year period, automatically renewed and typically charged the full amount for the next year, and every year thereafter if they do not cancel.  Customers can also sign up for Monitoring Service Plans on a free trial basis for a limited period of time, in which case, at the end of the initial trial period, their subscriptions are converted to paid monthly subscriptions and their Payment Methods are automatically charged the full monthly renewal rate associated with the subscription plan for the next month, and every month thereafter if they do not cancel.  Defendant's SimpliSafe Subscriptions constitute automatic renewal and/or continuous service plans or arrangements for the purposes of the ARL.  *See* Cal. Bus. & Prof. Code § 17601.

33.      To sign up for one of Defendant's SimpliSafe Subscriptions, the consumer must first select a program.  From a single webpage, prospective subscribers can review and compare the features of – and find links to the individual enrollment webpages for – each of Defendant's subscription offerings, including the SimpliSafe Subscriptions at issue.

34.      Consumers can sign up for one of Defendant's SimpliSafe Subscription plans through the SimpliSafe Website or the SimpliSafe Apps (collectively, the "SimpliSafe Platform"). Customers who purchase an SimpliSafe Subscription via the SimpliSafe Platform are automatically enrolled by Defendant in their chosen SimpliSafe Subscription program going forward, by default. In addition, customers may sign up for any of the SimpliSafe Subscriptions on a free-trial basis for a limited time.  Nevertheless, customers that enroll in a free trial, like those that sign up for a paid

subscription, must provide Defendant their payment information at the time of enrollment. Customers' free trial subscriptions automatically convert to paid monthly subscriptions at the end of the trial period, at which point those users are also automatically enrolled by Defendant in their chosen SimpliSafe Subscription program, and as such their Payment Methods are automatically charged by Defendant on a recurring monthly or yearly basis in the amount of the full, promotional, or discounted rate associated with that program, continuing indefinitely until the customer takes affirmative steps to cancel.

35.     The enrollment process for each SimpliSafe Subscription is substantially the same, regardless of the medium used.  For instance, after selecting one of the SimpliSafe Subscriptions, those navigating the enrollment process on the SimpliSafe Website are directed to another, final webpage where prospective subscribers are prompted to input their payment information and then invited to complete their purchase (the "Checkout Page").  For the purposes of the ARL and this Complaint, the "relevant portion of the Checkout Page" refers to the text of that portion of the Checkout Page that appears "in visual proximity to the request for consent to the offer," which in this case pertains to text nearby the final blue button at the bottom of the Checkout Page that customers must click in order to complete the checkout process.

36.     By way of example, at least as of February 2023, when a consumer signs up for a free trial of the Monitoring Service Plans, the "relevant portion of the Checkout Page" refers to the disclosures in the block of text immediately below the blue "Submit" checkout button (*i.e.*, the "request for consent"), which contains the following language and appearance (red markings added for emphasis):

By submitting this order, you agree
to SimpliSafe's **Terms of Sale**, **Terms
of Service** and **Privacy Policy**.

37.     Regardless of how the consumer subscribes (via the SimpliSafe Website or the SimpliSafe Apps), and irrespective of which specific SimpliSafe Subscription program or plan the subscriber selects (whether free trial or straight-to-paid, monthly or annual), Defendant fails to disclose any of the terms of its auto-renewal programs either before or after checkout, and it never requires the individual consumer to read or affirmatively agree to any terms of service, *i.e.*, by requiring consumers to click a checkbox next to the automatic renewal offer terms before consumers complete the checkout process and submit their orders for their SimpliSafe Subscriptions.  Consequently, Defendant uniformly fails to obtain any form of consent from – or even provide effective notice to – their subscribers before charging consumers' Payment Methods on a recurring basis.

### D.     Defendant Violates California's Automatic Renewal Law

38.     At all relevant times, Defendant failed to comply with the ARL in three ways: (i) Defendant failed to present the automatic renewal offer terms in a clear and conspicuous manner and in visual proximity to the request for consent to the offer before the subscription or purchasing agreement was fulfilled, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (ii) Defendant charged Plaintiff's and Class members' Payment Methods without first obtaining their affirmative consent to the agreement containing the automatic renewal offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (iii) Defendant failed to provide an acknowledgment that included the automatic renewal offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also fails to provide an acknowledgment that discloses a toll-free telephone number or describes another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their SimpliSafe Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(c).

i.   **Defendant Fails To Clearly And Conspicuously Present The SimpliSafe Subscription Terms Before The Subscription Agreement Is Fulfilled And In Visual Proximity To The Request For Consent To The Offer.**

39.    First, the Checkout Page for the SimpliSafe Subscriptions does not present the complete "automatic renewal offer terms[,]" as defined by Cal. Bus. & Prof. Code § 17601(b), in violation of Section 17602(a)(1) of the ARL.  Specifically, using the pictured Checkout Page above as an example, the Checkout Page does not disclose that "the subscription or purchasing agreement will continue until the consumer cancels."  Cal. Bus. & Prof. Code § 17601(b)(1).  Indeed, the relevant portion of the pictured Checkout Page merely states that "By submitting this order, you agree to SimpliSafe's Terms of Sale, Terms of Service, and Privacy Policy."[28]  *See supra*.[29]  It contains no reference to terms such as "subscription," "automatic," "renewal," "cancel," "recurring," or the like.  In fact, no such language appears *anywhere* on the Checkout Page, let alone the relevant portion of it.  As such, with respect to each of the SimpliSafe Subscriptions, Defendant fails to disclose "[t]hat the subscription or purchasing agreement will continue until the consumer cancels," *id*. § 17601(b)(1), in the manner required by statute.  *See id*. § 17602(a)(1).

40.    For the same reason, Defendant also fails to present a complete "description of the cancellation policy that applies to the offer[,]" *see* Cal. Bus. & Prof. Code § 17601(b)(2).  With

---

[28] Moreover, to the extent that this statement is presented "in visual proximity" to the request for consent on the Checkout Page, based on its placement the statement is not "clear and inconspicuous" as the ARL requires because it is presented *below* the blue "Submit" button on the Checkout Page.  Any required information cannot be disclosed below the request for consent without violating the ARL, given that the ARL explicitly requires the disclosures to be made "**before** the subscription or purchasing agreement is fulfilled, and in visual proximity[] … to the request for consent to the offer." Cal. Bus. & Prof. Code § 17602(a)(1) (emphasis added); *see also id*. § 17602(f) ("The requirements of [Cal. Bus. & Prof. Code § 17602(a)] … apply only **prior** to the completion of the initial order for the automatic renewal or continuous service[.]") (emphasis added). That is, since customers must click the blue "Submit" button (*i.e.*, the request for consent) on the Checkout Page in order to complete the checkout process, in the context of the SimpliSafe Subscriptions the term "before" is interchangeable with "above."  This makes sense, given that a reasonable consumer would believe that all material terms and any information of note would appear on the Checkout Page before their consent is elicited or given.  Putting that together, Defendant must have provided the required disclosures *above* the "Submit" button of the Checkout Page, and information provided after or following this blue checkout button cannot satisfy the ARL.  Further, given its placement, the text of this hyperlink is quintessential fine print, and is therefore not "clear and inconspicuous" as the ARL requires.  Since businesses' "inclusion of autorenewal terms in fine print" was "the practice that led to ARL" in the first place, *Turnier v. Bed*

---

respect to cancellation, the Checkout Page is, yet again, utterly silent.  Indeed, the Checkout Page

for the SimpliSafe Subscriptions contains no explanation of *how* to cancel and no disclosure stating

by *when* a consumer must cancel to avoid charges, nor does it even allude to the fact that

subscribers *can* cancel at all.  For instance, Defendant does not specify anywhere on the Checkout

Page that customers must cancel their SimpliSafe Subscriptions "before the billing date" in order to

avoid "creat[ing] a charge for the coming month," or that "[s]ervice billing recurs [] on a monthly

basis on that same day of the month as the original bill date" or, "for any month where that date

does not occur, … on the last day of the month," as do terms set forth on other pages of

Defendant's website.[30]  Nor does it provide any contact method that the consumer can use to reach

out and affect cancellation, such as a toll-free phone number or an email address, or any

information whatsoever regarding *how* to cancel.  For example, the Checkout Page does not

mention that, in order to cancel, subscribers must "provide notice of termination to SimpliSafe by

[either] (1) regular mail, postage prepaid, or overnight delivery, by a reputable, national overnight

delivery service, to SimpliSafe's then current principal place of business, (2) calling SimpliSafe

Customer Support at 1-800-548-9508 and following the instructions provided, or (3) by any other

applicable Service cancellation method deployed by SimpliSafe (including any App "Initiate

Cancellation" processes which may create a cancellation request resulting in a call back by

---

*Bath & Beyond Inc.*, 517 F. Supp. 3d 1132, 1140 n.6 (S.D. Cal. 2021) (ARL Case) (citation omitted), even if such text contained required disclosures (it does not), it cannot satisfy the ARL.

[29] Of note, reference to hyperlinks leading to required disclosures set forth on other pages of the SimpliSafe Platform is not tantamount to disclosure of them on the Checkout Page, as the ARL requires.  *See Turnier*, 517 F. Supp. 3d at 1139-40 ("Defendant … argues the required terms were accessible through a hyperlink that was a few centimeters from the request for consent.  But the terms themselves—not the access point to them—need to be in visual proximity to the request.") (emphasis added).  Thus, it is not enough that the required disclosures may be set forth on the hyperlinked pages located elsewhere on the SimpliSafe Platform; the ARL requires that Defendant present them directly on the Checkout Page itself – and it must further do so "clearly and conspicuously," *id*. § 17601(c), and with the requisite "visual proximity … to the request for consent," *id*. § 17602(a)(1) (*i.e.*, they must appear in a conspicuous block of text immediately above the "Submit" button on that page) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase.  However, Defendant failed, and continues to fail, to satisfy the ARL's disclosure requirements, in violation of Section 17602(a)(1).

[30] SimpliSafe Terms of Service (last updated Feb. 2023), https://simplisafe.com/terms-of-service.

---

SimpliSafe to a user provided phone number to confirm cancellation).”[31]  Further, the Checkout

Page does not disclose the consequences associated with cancellation, including Defendant's policy

that “SimpliSafe shall not refund any unearned service charges with respect to any partial calendar

month following any termination,”[32] that the fact that customers who own SimpliSafe cameras but

cancel their “professionally monitored [SimpliSafe Subscription] plan[s] … will” lose, among

other things, “access to[] … [u]nlimited camera recording and evidence capture” and the “ability to

download video recordings from the [SimpliSafe A]pp to [their] phone[s],”[33] as are also disclosed

elsewhere on the SimpliSafe Platform.  These terms omitted from the Checkout Page constitute

material aspects of Defendant's cancellation policy.

41.     As a result of the inadequate disclosures and/or outright omissions on the Checkout

Page, Plaintiff was not previously aware of the above aspects of Defendant's cancellation policy.

At no point during the life of her SimpliSafe Subscription was Plaintiff required or even prompted

to navigate to or otherwise examine any of the terms disclosed on the on any other page of the

LinkedIn Platform aside from the Checkout Page.  Yet, prior to checkout, Defendant was obligated

by law to place consumers on notice of these aspects of Defendant's cancellation policy in

---

[31] *Cf. id*. (“SimpliSafe or Subscriber may terminate this Agreement for any reason or no reason following notice sent to the other as set forth in this section and the confirmation of legitimacy of the Subscriber request by SimpliSafe.  <u>Subscriber shall provide notice of termination to SimpliSafe by (1) regular mail, postage prepaid, or overnight delivery, by a reputable, national overnight delivery service, to SimpliSafe's then current principal place of business, (2) calling SimpliSafe Customer Support at 1-800-548-9508 and following the instructions provided, or (3) by any other applicable Service cancellation method deployed by SimpliSafe (including any App 'Initiate Cancellation' processes which may create a cancellation request resulting in a call back by SimpliSafe to a user provided phone number to confirm cancellation)</u>.  Such notice by Subscriber shall be effective upon SimpliSafe's receipt and confirmation thereof.  In the case of a written request for cancellation, SimpliSafe reserves the right to contact the subscriber to perform the company's standard account holder security questions to confirm the legitimacy and accuracy of the request. … You understand that termination of these Services can potentially impact the ability of life saving services to be rendered and may require confirmation by Customer Service to confirm the legitimacy of any such request (e.g. the identity of the account holder, that the request for termination is authentic and not made under duress by any third parties, requested date for cancellation if it is in the future, etc.).”) (emphasis added); *see also* SimpliSafe Terms of Sale (last updated Jul. 2022), https://simplisafe.com/terms-sale (noting that subscribers may “call[ ] SimpliSafe Customer Support at 1-888-95-SIMPLI (957-4675)”).

[32] *Id*.

[33] SimpliSafe Support, *What are the service plan options?* (updated Mar. 2023), https://support.simplisafe.com/articles/alarm-events-monitoring/what-are-the-service-plan-options/6344794a013ba90af0bce6a4 (last accessed Mar. 8, 2023).

---

accordance with the ARL, which requires that companies provide such information "in visual proximity to the request for consent to the [automatic renewal] offer."  Cal. Bus. & Prof. Code § 17602(a)(1); *see also id.* § 17601(b)(2).  It is not enough that the cancellation policy may be set forth on the hyperlinked pages located elsewhere on the SimpliSafe Website; the ARL requires that Defendant present its full cancellation policy directly on the Checkout Page – and it must further do so "clearly and conspicuously," *id.* § 17601(c), and with the requisite proximity (*i.e.*, they must appear in the block of text immediately above the "Submit" button on that page), *see id.* § 17602(a)(1) – so as to allow the consumer to read and review the applicable offer terms immediately prior to purchase.  However, Defendant failed, and continues to fail, to satisfy that requirement, in violation of Section 17602(a)(1) of the ARL.

42.     Additionally, the Checkout Page for the SimpliSafe Subscriptions does not adequately disclose the recurring amount to be charged to the subscriber's Payment Method each billing period.  That is, although the Checkout Page presents <u>eight</u> different dollar figures, those figures fail to satisfy the Section 17602(a) pre-purchase disclosure requirements with respect to the recurring amount(s) to be charged to the subscriber's Payment Method each billing period, for three independent reasons.  ***First***, as shown in the exemplar Checkout Page above (*see supra* at ¶ 36), these dollar figures are presented on the top half of the Checkout Page in the block of text following the words "Order summary"—far on the webpage from the "Submit" button—which is not the portion of the Checkout Page with which the ARL is concerned.  By contrast, the relevant portion of the Checkout Page (*i.e.*, the portion in "visual proximity" to the request for consent, *see supra*) is utterly silent as to the recurring amount(s) to be charged following enrollment and/or, where applicable, at the end of the initial trial or promotional period.  In fact, no price term whatsoever appears in visual proximity to the blue "Submit" button near the bottom of the webpage (*i.e.*, the request for consent featured on the Checkout Page).  ***Second***, by presenting several different dollar figures, the Checkout Page is intentionally misleading, and it remains unclear based on this text which of the eight different dollar figures presented in this portion of the Checkout Page, if any, reflect the precise amount to be charged to the subscriber's Payment Method every billing period in connection with the SimpliSafe Subscription.  ***Third***, in any case,

even if the price terms shown in the screenshot above were presented clearly, conspicuously, and within the relevant portion of the Checkout Page (they are not), these so-called disclosures still fail to place subscribers on notice of the amount that will be charged to their Payment Methods each billing period.  That is because the listed price for the Monitoring Plan selected is "$0.00," with absolutely no reference to any future recurring charges after the first month, how much the plan is normally worth, or the upcoming date on which the consumer will start receiving charges.  A subscriber reading these statements would likely be unaware as to whether the consumer will be charged on a subsequent occasion, and if so, in precisely what amount.  Thus, with respect to each of the SimpliSafe Subscriptions, Defendant fails to provide notice of "[t]he recurring charges that will be charged to the consumer's [Payment Method] as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known[,]" Cal. Bus. & Prof. Code § 17601(b)(3), in violation of Section 17602(a)(1) of the ARL.  Defendant fails to disclose "[t]he length of the automatic renewal term or that the service is continuous," Cal. Bus. & Prof. Code § 17601(b)(4), in further violation of Section 17602(a)(1) of the ARL.

43.     Finally, the Checkout Page fails to adequately disclose the length of the automatic renewal term associated with the SimpliSafe Subscriptions, *see* Cal. Bus. & Prof. Code §§ 17601(b)(4), 17602(a)(1).  Indeed, as with the automatic renewal feature and cancellation policy, with respect to duration of each renewal period, the Checkout Page is, yet again, utterly silent.  Although other webpages of the SimpliSafe Platform make it clear that "[s]ervice billing recurs thereafter on a monthly basis on that same day of the month as the original bill date,"[34] the word "month" appears nowhere on the Checkout Page, and nor does it contain any other reference to a fixed subscription period or the timing of any subsequent charges in connection with the SimpliSafe Subscriptions.  *See supra*.

44.     As a result of Defendant's missing and otherwise deficient pre-purchase disclosures, when Plaintiff selected and enrolled in his automatic renewal program for a free trial SimpliSafe

---

[34] SimpliSafe Terms of Service (last updated Feb. 2023), *supra*.

1     Subscription, he was unaware that Defendant had enrolled him in "automatic renewal" programs

2     under which his subscription would renew each month and result in continuous monthly automatic

3     renewal charges to his Payment Method unless and until he successfully canceled the subscription.

### ii.   Defendant Fails To Obtain Consumers' Affirmative Consent To The Automatic Renewal Terms Associated With The SimpliSafe Subscriptions.

45.     Second, Defendant does not at any point during the checkout process require

consumers to read or affirmatively agree to any terms of service associated with their SimpliSafe

Subscriptions, *e.g.,* by requiring consumers to select or click a "checkbox" next to the automatic

renewal offer terms to complete the checkout process.  Accordingly, when Defendant automatically

renews customers' SimpliSafe Subscriptions, Defendant charges consumers' Payment Methods

without first obtaining their affirmative consent to the agreement containing the automatic renewal

offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2).

### iii.   Defendant Fails To Provide A Post-Checkout Acknowledgment That Clearly And Conspicuously Discloses The Required SimpliSafe Subscription Offer Terms.

46.     Finally, after Plaintiff and the members of the Class subscribed to one of

Defendant's SimpliSafe Subscriptions, Defendant sent to Plaintiff and the Class email follow-ups

regarding their purchases (the "Acknowledgment Email").

47.     By way of example, at least as of March 2022, the subject line of the

Acknowledgment Email that Defendant sent to SimpliSafe subscribers stated: "Your Order at

SimpliSafe."  The body of the Acknowledgment Email contained, in relevant part, the following

text and images (red box added to highlight relevant text):[35]

---

[35] The Acknowledgment Email shown below is the version Plaintiff received from Defendant, with redactions, upon initial enrollment in the SimpliSafe Subscription on or around March 16, 2022.

From: <customer-support@simplisafe.com>
Date: Wed, Mar 16, 2022 at 8:25 PM
Subject: Your Order at SimpliSafe
To: ███████████████████

## Simpli**Safe**

# Things are about to get a whole lot safer.

## Order #23752064

Thank you for your order!

Please allow us a few days to get your order processed. We will send you an email as soon as your order has shipped.

## Shipping Details

Shipping Address

Billing Address

## Order Details

1 x SimpliSafe Custom Home Security System: $769.93
1 x Base Station (Cloud)
1 x Wireless Keypad (Cloud)
2 x Motion Sensor
3 x Outdoor Security Camera
1 x Free Yard Sign
2 x Window Decals

Interactive Alarm Monitoring - 30 Days Free: $0.00

Order Subtotal: $769.93
Tax: $31.75
**Total for this Order: $455.18**
Free Shipping (7-10 business days): $0.00

## Questions?

Call **1-800-548-9508** or email customer-support@simplisafe.com

---

1
2
3
4
5
6
7
8
9



48.     The Acknowledgment Email contains even less of the required information than is featured on the relevant portion of the Checkout Page, discussed above.  Namely, the purchase confirmation does not clearly and conspicuously provide: that the SimpliSafe Subscription "will continue until the consumer cancels" (Cal. Bus. & Prof. Code § 17601(b)(1)); any "description of the cancellation policy that applies to the offer" (*id*. § 17601(b)(2)); "[t]he recurring charges that will be charged" to the subscriber's Payment Method each billing period (*id*. § 17601(b)(3)); or "[t]he length of the automatic renewal term" (*id*. § 17601(b)(4)).  Further, it fails to provide any information regarding how to cancel the SimpliSafe Subscriptions, *id*. § 17602(a)(3).  Any such disclosures of required automatic renewal offer terms are either missing altogether or are deceptively incomplete, objectively inaccurate, and/or are inconspicuously buried in the tiny, blue text linking to other terms and conditions pages not shown at the bottom of the Acknowledgment Email (*i.e.*, hidden in the fine print).  As such, the acknowledgment fails to disclose "the automatic renewal offer terms … , cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer" in violation of Section 17602(a)(3) of the ARL.

49.     Additionally, the Acknowledgment Email fails to provide a toll-free telephone number or describe another cost-effective, timely, and easy-to-use mechanism for cancellation, and in fact Defendant makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their SimpliSafe Subscriptions, which further violates Section 17602(c) of the ARL.

**iv. <u>Defendant Fails To Provide A Post-Checkout Acknowledgment
That Clearly And Conspicuously Discloses The Required
SimpliSafe Subscription Offer Terms.</u>**

50.     Finally, the "mechanism for cancellation" of the SimpliSafe Subscriptions is not one
that Plaintiff or reasonable consumers would consider "timely" or "easy-to-use" as the ARL
requires.  *See* Cal. Bus. & Prof. Code § 17602(c).  As is discussed further below, Plaintiff tried but
failed to affect cancellation in November 2022—not once but multiple times.  Thus, as a direct
result of Defendant's non-compliant cancellation mechanism, Plaintiff and putative Class Members
have incurred substantial financial injury.

* * *

51.     In sum, Defendant's deficient pre- and post-purchase disclosures and lack of
affirmative consent fail to comply with the ARL.  By and through these actions, Defendant has
charged Plaintiff's and Class members' Payment Methods in direct violation of the ARL.  As a
result, all goods, wares, merchandise, and/or products sent to Plaintiff and the Class upon the
automatic renewal of their continuous service agreements are deemed to be "unconditional gifts"
pursuant to Cal. Bus. & Prof. Code § 17603.

52.     Because Defendant failed to disclose this material information in the manner
required by statute, Plaintiff was unable at the point of sale to accept or provide affirmative consent
to Defendant's offer or knowingly enter into to the purchase agreements.  Thus, as a direct result of
Defendant's missing, incomplete, and otherwise deficient disclosures on the Checkout Page and in
the Acknowledgment Email, Plaintiff was induced to sign up for, unable to terminate, and
automatically charged for his SimpliSafe Subscription.

53.     Accordingly, Plaintiff brings this action individually and on behalf of similarly
situated individuals against Defendant for violations of California's consumer protections statutes,
including California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200.  As set
forth in detail below, Plaintiff's claims, which are based on Defendant's failure to comply with the
ARL, arise under the "unlawful" prong of the UCL.  Further, because the SimpliSafe Subscriptions
were, by operation of law, "unconditional gifts" to Plaintiff and putative Class Members (*see* Cal.

Bus. & Prof. Code § 17603) – and thus, Plaintiff and Class Members already owned the goods, tools, and benefits of the subscriptions as their personal property at the time Defendant withdrew monies from their Payment Methods as consideration for access to the same, without any legal or contractual authority to do so – Plaintiff's claims are also based on Defendant's practice of charging consumers in exchange unconditional gifts also arise under the "fraudulent" and "unfair" prongs of the UCL.  Additionally, Plaintiff brings this action against Defendant for violations of the CLRA and FAL, and for conversion, unjust enrichment, negligent misrepresentation, and fraud.

## **PLAINTIFF'S INDIVIDUAL ALLEGATIONS**

54.     Plaintiff Gregory Krikorian is an individual consumer who signed up for a free trial to Defendant's Interactive Monitoring Plan with his purchase of Defendant's Home Security System in or around March 2022, from Defendant's website while in California.  At the time Mr. Krikorian signed up for his SimpliSafe Subscription, he provided his Payment Method information directly to Defendant.

55.     Before Mr. Krikorian purchased his SimpliSafe Subscription, Defendant did not disclose to Mr. Krikorian all required automatic renewal offer terms associated with the subscription program.  Additionally, although the Checkout Page from which Mr. Krikorian made his purchase included some relevant information regarding automatic renewal, the manner in which this information was presented was insufficient to put Mr. Krikorian on notice of the material automatic renewal offer terms applicable to the SimpliSafe Subscriptions.  Specifically, prior to completing his SimpliSafe Subscription order, the relevant screens and buttons presented to Mr. Krikorian did not clearly and conspicuously state that his SimpliSafe Subscription would automatically renew every month until he cancelled; they did not state the recurring charges that would be charged to Mr. Krikorian's Payment Method as part of the automatic renewal plan, explain that the timing of the charge would change, or disclose the monthly date to which the charge would change; and they did not describe the full cancellation policy that applied to the purchase.

56.     Moreover, at no point prior to completing her initial purchase did Defendant obtain Mr. Krikorian's affirmative consent to an agreement containing the automatic renewal offer terms.

57.     After Mr. Krikorian completed his initial order, Defendant sent Mr. Krikorian an Acknowledgment Email stating that his SimpliSafe Subscription had been activated.  However, that Acknowledgment Email failed to provide Mr. Krikorian with the complete automatic renewal terms that applied to Defendant's offer, a description of Defendant's full cancellation policy, or information regarding how to cancel Mr. Krikorian's SimpliSafe Subscription in a manner capable of being retained by him.  Mr. Krikorian did not receive any other acknowledgments that contain the required information.

58.     As a result of Defendant's missing and otherwise deficient disclosures, when Mr. Krikorian selected and enrolled in his free trial SimpliSafe Subscription, he was unaware that Defendant enrolled him in an "automatic renewal" program under which the subscription would renew each month and result in continuous monthly automatic renewal charges to his Payment Method unless and until Plaintiff chose to cancel.

59.     Nevertheless, on or around May 3, 2022, Defendant automatically renewed Mr. Krikorian's SimpliSafe Subscription and charged his Payment Method in the amount of $27.99, the full monthly rate associated with the paid monthly Interactive Monitoring Plan.  Thereafter, Defendant continued to automatically renew Mr. Krikorian's SimpliSafe Subscription at the full standard rate on a monthly basis, charging his Payment Method an additional six (6) times, for a total of seven (7) unauthorized charges to Mr. Krikorian's Payment Method between March 2022 and November 2022, without Mr. Krikorian's knowing consent.

60.     Mr. Krikorian's confusion and surprise with respect to Defendant's billing practices is the direct result of Defendant's failure to place Mr. Krikorian on notice of the recurring amount that would be charged to his Payment Method as part of the SimpliSafe Subscription.  Because Defendant failed to disclose this material information in the manner required by statute, Mr. Krikorian was unable at the point of sale to accept Defendant's offer or knowingly enter into to the purchase agreement.

**Defendant's Undisclosed Cancellation Policy**

61.     Frustrated with Defendant's confusing billing practices and other hidden automatic renewal terms, Mr. Krikorian attempted to cancel his SimpliSafe Subscription in or around

November 2022.  However, finding no useful guidance in the vague and incomplete terms that were presented to him on the Checkout Page at the point of sale and later in the Acknowledgment Email, Mr. Krikorian struggled immensely with the cancellation process.  Specifically, Mr. Krikorian accessed his account through SimpliSafe's website and could not find an unsubscribe option for his Subscription anywhere.  Finding no successful cancellation options on Defendant's website, Mr. Krikorian's attempt at cancellation was utterly ineffective.  Mr. Krikorian resorted to calling Defendant directly to attempt to cancel, which was similarly difficult and time-consuming as the representative he spoke to made it exceedingly difficult to cancel, instead offering him a multitude of other options prior to finally allowing Mr. Krikorian to cancel.

62.     Ultimately, Mr. Krikorian was unable to cancel his SimpliSafe Subscription until November 1, 2022, but by that point the damage had been done.  As shown by the table below, during this period, Defendant charged, in total, at least $195.93 in unauthorized renewal fees to Mr. Krikorian's Payment Method without his knowing or affirmative consent.

| Billing Date | Amount |
|---|---|
| 05/03/2022 | $27.99 |
| 05/28/2022 | $27.99 |
| 06/29/2022 | $27.99 |
| 07/28/2022 | $27.99 |
| 08/27/2022 | $27.99 |
| 09/30/2022 | $27.99 |
| 10/27/2022 | $27.99 |
| | **Total: $195.93** |

63.     Additionally, once Mr. Krikorian's SimpliSafe Subscription was finally terminated – which only happened after several unsuccessful cancellation attempts – Mr. Krikorian discovered that the SimpliSafe camera he had purchased as a one-time transaction was unable to operate without an active SimpliSafe Subscription.  As discussed above, owners of a SimpliSafe camera who do not enroll in or cancel their "professionally monitored [SimpliSafe Subscription] plan[s] …

will not," among other things, "have access to[] … [u]nlimited camera recording and evidence

capture" or have the "ability to download video recordings from the [SimpliSafe A]pp to [their]

phone[s]." *See supra* ¶ 40 & n.33.  However, this consequence of cancellation was not disclosed

on the Checkout Page that Plaintiff reviewed at the point of purchase or the Acknowledgment

Email he received subsequent thereto.  Thus, prior to cancellation, Mr. Krikorian was under the

impression that he would be able to use the SimpliSafe-branded equipment, which he had

purchased as a one-time transaction separate and apart from his enrollment in the recurring

SimpliSafe Subscription, without paying the monthly service fee associated with Defendant's

subscription program.  But, as Plaintiff and other subscribers discovered long after their initial

enrollments, that is not true.  Indeed, as shown below, numerous subscribers have left scathing

reviews on the Defendant's own website, complaining of a similar loss of equipment functionality

following cancellation:



---

[36] *See* https://support.simplisafe.com/conversations/apps-and-login/cant-access-system-online-or-in-the-app-after-canceling-subscription/63478dc7232e4267b001ae5c (last accessed Mar. 8, 2023).



**werwulf**
8 Messages

Friday, February 4th, 2022 7:22 AM

## Cancelling your plan breaks cameras

If you cancel from a paid plan to self monitoring, there's a bug that basically causes your cameras to behave as if they still had a plan i.e it tries to control the shutters automatically and this causes problems with shutters randomly opening and triggering motion notifications (very annoying). You can tell they're broken because each camera in the app doesn't show the 'Privacy' slider to manually control the shutter. You can also go into the camera settings and change them and you get shown the screen you would as if you had a plan. Spoke with support a while back about this and we found that adding camera to a new location fixed this. Problem is, I now have all my devices on the original location except my cameras which are now on a new location. There's no way to easily move everything across either. Please fix this bug so I can put my camera back on the original location.

37



**jaenkesj**
1 Message

8 days ago

This also happened to me...

38

**SI** **sim**
1 Message

7 months ago

I've only had the system about a week but chose from the start not to have the monitoring. I'm a bit frustrated with it to be honest because there seems to be no way to "set up" the system in the app without having a monitoring plan. I therefore cannot remote manage my system; arm/disarm whilst away - despite claims on the website to allow this.

I do have a camera and can access the live feed and receive and manage motion alerts through the app. The camera functionality seems to be completely separate to the rest of the system if you don't have a plan. So this disjointed factor is also a bit disappointing.

The camera obviously can't record events unless you have the camera plan but if you're happy with just live real-time alerts on motion (as I am) then this might not be much of a concern.

If you don't have a camera or monitoring plan then the app is completely useless from what I've so far been able to work out. I'd be happy to be proven wrong on this though if somebody more experienced is able to comment on what I might be missing.

I'm still eagerly awaiting the doorbell currently available in the US. Assurance that this was coming soon prompted me to go with SS. However, if this takes many more months then that might be the straw that breaks the camel's back for me.

39

---

[37] *See* https://support.simplisafe.com/conversations/cameras/cancelling-your-plan-breaks-cameras/61fd449a23c1a32f12e0fdbe (last accessed Mar. 8, 2023).

[38] *See id.*

[39] *See* https://support.simplisafe.com/conversations/monitoring-service/cancelling-my-plan/62b1b8aeae73c605a68743e9 (last accessed Mar. 8, 2023).

---

1
2
3
4
5
6
7
8
9
10



11      64.    Accordingly, upon cancellation Mr. Krikorian's camera became worthless to him.

12  Therefore, as a direct result of Defendant's undisclosed cancellation policy, Mr. Krikorian suffered

13  a further consequential damages in the form of loss of money and/or property.

14      65.    Notably, neither the Checkout Page nor the Acknowledgment Email contain any

15  explanation whatsoever regarding how and when to cancel or the consequences of cancellation the

16  SimpliSafe Subscriptions.  As a result, based on the pre- and post-check out disclosures featured on

17  the Checkout Page and in the Acknowledgment Email, at the time of his initial enrollment and for

18  most of the life of his SimpliSafe Subscription, Mr. Krikorian did not know as a basic matter that

19  the subscription program would automatically renew and result in recurring charges to his Payment

20  Method or that cancellation was required to stop those charges.  Nor was he aware of the other

21  material aspect of Defendant's cancellation policy discussed above, such as the mechanisms for

22  effecting cancellation, the deadline to cancel, or the consequences of doing so.

23      66.    Mr. Krikorian was not previously aware of any of the above aspects of Defendant's

24  cancellation policy.  At no point during his SimpliSafe Subscription was Mr. Krikorian required or

25  even prompted to navigate to or otherwise examine any of the terms disclosed on the on any other

26  page of the SimpliSafe Website aside from the Checkout Page.  Further, Defendant neglected to

27  ───────────────

28  [40] *See* https://support.simplisafe.com/conversations/monitoring-service/how-do-i-cancel-my-monitoring-subscription/6190c6548ea41ebb0620f414 (last accessed Mar. 8, 2023).

disclose this information to Mr. Krikorian at the point of purchase on the Checkout Page or in the Acknowledgment Email that Defendant sent to Mr. Krikorian after he completed the checkout process.  Accordingly, Defendant failed to place Mr. Krikorian on notice of its cancellation policy or provide Mr. Krikorian information regarding how to cancel in a manner that is capable of being retained by him, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(1)-(3).

67.     Mr. Krikorian's confusion and surprise with respect to, *inter alia*, Defendant's automatic renewal policies and practices – including the basic fact of automatic renewal, the amount and timing of the recurring renewal fees she incurred during the life of his SimpliSafe Subscription – is the direct result of Defendant's failure to adequately place Mr. Krikorian on notice of several material automatic renewal offer terms associated with his SimpliSafe Subscription.  That is, Mr. Krikorian was not made aware of the fact that Defendant enrolled him in an "automatic renewal" program under which his SimpliSafe Subscription would automatically renew each month after the initial one-month trial period, unless and until Mr. Krikorian took action to effectively cancel that subscription, nor was he apprised of the recurring price to be charged or of the length of the applicable automatic renewal term associated with his SimpliSafe Subscription.  Because Defendant failed to disclose this material information in the manner required by statute, Mr. Krikorian was unable at the point of sale to accept Defendant's offer or knowingly enter into to the purchase agreement.

68.     Additionally, as discussed above, neither the Checkout Page nor the Acknowledgment Email adequately explain how to cancel the SimpliSafe Subscriptions, provide contact information that the consumer can use to reach out to Defendant and affect cancellation (such as email address or toll-free phone number), or state the consequences of cancellation— especially with respect to the consumer's ability to obtain a partial and/or full refund following cancellation.  As a result, Mr. Krikorian was not previously aware of any of the altogether omitted aspects of Defendant's cancellation policy.  At no point during his SimpliSafe Subscription was Mr. Krikorian required or even prompted to navigate to or otherwise examine any of the terms disclosed on the on any other page of the SimpliSafe Website aside from the Checkout Page.  Further, Defendant neglected to disclose this information to Mr. Krikorian at the point of purchase

on the Checkout Page or in the Acknowledgment Email that Defendant sent to Mr. Krikorian after he completed the checkout process.  Accordingly, Defendant failed to place Mr. Krikorian on notice of its cancellation policy or provide Mr. Krikorian information regarding how to cancel in a manner that is capable of being retained by him, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3), 17602(c).

69.     Moreover, even if the Acknowledgment Email had contained Defendant's complete cancellation policy (it did not), the "mechanism for cancellation" that exists is not one that Mr. Krikorian and other reasonable consumers would consider "timely" or "easy-to-use."  Defendant therefore failed to provide Mr. Krikorian with a "timely[] and easy-to-use mechanism for cancellation" or describe any such mechanism in an Acknowledgment Email, in violation of Cal. Bus. & Prof. Code § 17602(c).

70.     Thus, as a direct result of Defendant's missing and otherwise deficient disclosures on the Checkout Page and in the Acknowledgment Email, and its non-compliance cancellation mechanism, Mr. Krikorian was induced to sign up for, and unable to terminate, his SimpliSafe Subscription.

71.     Defendant's failure to fully and adequately disclose the automatic renewal offer terms associated with the SimpliSafe Subscriptions on the Checkout Page and in the Acknowledgment Email, its failure to obtain Mr. Krikorian's affirmative consent before charging his Payment Method on a recurring basis, and its failure to issue a refund for the several months of unauthorized renewal charges it posted to Mr. Krikorian's Payment Method notwithstanding the lack of affirmative consent, are contrary to Section 17603 of the ARL, which deems products provided in violation of the statute to be an "unconditional gift" to consumers that they "may use or dispose of … in any manner [they] see[] fit without any obligation whatsoever on the consumer's part to the business."  Cal. Bus. & Prof. Code § 17603.

72.     Further, Defendant's practice of remotely disabling these goods, features, benefits, and tools of the SimpliSafe Subscriptions upon cancellation is also contrary to Section 17603 the ARL.  *See id.*  That is, because Defendant violated the ARL as described above and below, the goods that Plaintiff received in connection with her SimpliSafe Subscription were, in fact and by

operation of law, "unconditional gifts" to her.  In other words, Plaintiff assumed absolute ownership of these subscription benefits from the moment she received them, and Defendant was not entitled to interfere with her continued ownership, possession, and/or use of such goods.

73.     As a direct result of Defendant's unlawful conduct described above, Mr. Krikorian suffered economic injury.  Specifically, Defendant's ARL violations caused Mr. Krikorian's financial injury because Mr. Krikorian reasonably relied on Defendant's conspicuous disclosures of the Checkout Page and the Acknowledgment Email (and, as a natural corollary, Defendant's omissions and/or the inconspicuousness of the disclosures contained therein) in deciding whether to purchase his SimpliSafe Subscription in the first place and whether to continue paying for it after that (*i.e.*, by not cancelling the auto-renewal).

74.     Had Defendant complied with the ARL by adequately disclosing – and obtaining Mr. Krikorian's affirmative consent to – the requisite SimpliSafe Subscription terms on the Checkout Page at the point of Mr. Krikorian's initial enrollment in March of 2022, Mr. Krikorian would have been able to read and review the auto renewal terms prior to purchase and he would have not subscribed to the Interactive Monitoring Plan, thereby avoiding financial injury of any kind as a result of Defendant's ARL violations.  Similarly, had Defendant complied with the ARL by adequately disclosing the terms associated with Mr. Krikorian's SimpliSafe Subscription in the post-checkout Acknowledgment Email (*i.e.*, after initial enrollment but before any one of the 7 times Defendant subsequently automatically renewed Mr. Krikorian's SimpliSafe Subscription and charged his Payment Method accordingly), Mr. Krikorian would have been able to read and review the auto renewal terms prior to renewal, and he would have canceled his SimpliSafe Subscription prior to the expiration of the subscription period in which he would have learned such information, thereby avoiding all or part of the $195.93 in automatic renewal charges Mr. Krikorian incurred from March 2022 and November 2022.

75.     But Defendant did not adequately disclose the required automatic renewal terms in either the Checkout Page or the Acknowledgment Email, thereby depriving Mr. Krikorian of the opportunity to make an informed decision as to the transaction.

76.     The facts giving rise to Mr. Krikorian's claims are materially the same as the Class he seeks to represent.

## CLASS ACTION ALLEGATIONS

77.     ***Class Definition***. Plaintiff brings this action pursuant to Rule 23(a) of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All persons in California who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, incurred renewal fee(s) in connection with Defendant's offerings for paid SimpliSafe Subscriptions.

78.     Specifically excluded from the Class are Defendant and any entities in which Defendant have a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, members of the judge's staff, and the judge's immediate family.

79.     Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

80.     ***Numerosity.***  Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, the Class comprises at least thousands of consumers throughout California.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

81.     ***Commonality and Predominance***.  Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant's SimpliSafe Subscriptions constitute "Automatic renewal[s]" within the meaning of Cal. Bus. & Prof. Code § 17601(a); (b) whether Defendant failed to present the automatic renewal offer terms, or continuous service offer terms, in a clear and conspicuous manner before the subscription or purchasing agreement was fulfilled and in visual proximity to the request for consent to the offer, in violation of Cal. Bus. & Prof. Code § 17602(a)(l); (c) whether Defendant charged Plaintiff's and

Class members' Payment Method for an automatic renewal or continuous service without first obtaining their affirmative consent to the automatic renewal offer terms or continuous service offer terms in violation of Cal. Bus. & Prof. Code § 17602(a)(2); (d) whether Defendant failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, cancellation policy, and information on how to cancel in a manner that is capable of being retained by Plaintiff and the Class, in violation of Cal. Bus. & Prof. Code § 17602(a)(3); (e) whether the goods and services provided by Defendant are deemed an "unconditional gift" in accordance with Cal. Bus. & Prof. Code § 17603; (f) whether Defendant's conduct alleged herein violated California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and/or California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (g) whether Defendant's conduct alleged herein constitutes conversion and/or unjust enrichment; (h) whether Plaintiff and the Class are entitled to damages and/or restitution; (i) whether Defendant should be enjoined from further engaging in the misconduct alleged herein; and (j) whether Plaintiff and the Class are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

82.     ***Typicality.***  The claims of Plaintiff are typical of the claims of the Class in that Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to obtain Plaintiff's and the Class's affirmative consent to the automatic renewal offer terms or continuous service offer terms associated with the SimpliSafe Subscriptions before charging their Payment Methods.

83.     ***Adequacy***.  Plaintiff will fairly and adequately protect Class members' interests. Plaintiff has no interests antagonistic to Class members' interests, and Plaintiff has retained counsel that have considerable experience and success in prosecuting complex class-actions and consumer-protection cases.

84.     ***Superiority***.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy for, *inter alia*, the following reasons: prosecutions of individual actions are economically impractical for members of the Class; the Class is readily

definable; prosecution as a class action avoids repetitious litigation and duplicative litigation costs, conserves judicial resources, and ensures uniformity of decisions; and prosecution as a class action permits claims to be handled in an orderly and expeditious manner.

85.     Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

86.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and will likely retain the benefits of its wrongdoing.

87.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

**COUNT I**
**Violations of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

88.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

89.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

90.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act[.]"  Cal. Bus. & Prof. Code § 17200.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or herself and others similarly situated who are affected by the unlawful and/or unfair business practice or act.

91.     As alleged below, Defendant has committed unlawful, fraudulent, and/or unfair business practices under the UCL by: (a) representing that Defendant's goods and services have certain characteristics that they do not, in violation of Cal. Civil Code § 1770(a)(5); (b) advertising goods and services with the intent not to sell them as advertised, in violation of Cal. Civil Code § 1770(a)(9); and (c) converting to Defendant's own use and benefit money that rightfully belongs to Plaintiff and the Class.

92.     Additionally, at all relevant times, Defendant has violated, and continues to violate, the UCL's proscription against engaging in unlawful, fraudulent, and/or unfair conduct as a result of its violations of the ARL, Cal. Bus. & Prof. Code §§ 17600, *et seq.*  Specifically, Defendant failed, and continues to fail, to:  (a) provide the auto-renewal terms associated with its SimpliSafe Subscriptions "in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity[] … to the request for consent to the offer," in violation of Cal. Bus. & Prof. Code § 17602(a)(1); (b) obtain the affirmative consent of Plaintiff and the Class to those terms before charging their Payment Methods, in violation of Cal. Bus. & Prof. Code § 17602(a)(2); and (c) provide an acknowledgment that includes the automatic renewal or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code §§ 17602(a)(3).  Defendant also makes it exceedingly difficult and unnecessarily confusing for consumers to cancel their SimpliSafe Subscriptions, in violation of Cal. Bus. & Prof. Code § 17602(b).

93.     Each of these acts and practices constitutes an independent violation of the ARL, and thus an independent violation of the UCL.

94.     All products received from Defendant in violation of the ARL, Cal. Bus. Prof. Code §§ 17602, *et seq.*, constitute "unconditional gifts."  *See* Cal. Bus. Prof. Code § 17603.  As a direct and proximate result of Defendant's unlawful and/or unfair practices described herein, Defendant has received, and continues to hold, unlawfully obtained property and money belonging to Plaintiff and the Class in the form of payments made by Plaintiff and Class members for their SimpliSafe Subscriptions.  Defendant has profited from its unlawful, fraudulent and/or unfair acts and practices in the amount of those business expenses and interest accrued thereon.

95.     Defendant's acts and omissions as alleged herein violate obligations imposed by statute, are substantially injurious to consumers, offend public policy, and are immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

96.     There were reasonably available alternatives to further Defendant's legitimate

business interests, other than the conduct described herein.

97.     Defendant's acts, omissions, nondisclosures, and misleading statements as alleged herein were and are false, misleading, and/or likely to deceive the consuming public.

98.     Plaintiff and the members of the Class have suffered a substantial injury in fact and lost money by virtue of Defendant's acts of unfair competition, which caused them to purchase the SimpliSafe Subscriptions.  Had Defendant complied with its disclosure obligations under the ARL, Plaintiff and members of the Class would not have purchased their SimpliSafe Subscriptions or would have cancelled their SimpliSafe Subscriptions prior to the renewal of the subscriptions, so as not to incur additional fees.  Thus, Plaintiff and members of the Class were damaged and have suffered economic injuries as a direct and proximate result of Defendant's unlawful and/or unfair business practices.

99.     Defendant's violations have continuing and adverse effects because Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this unlawful course of conduct.  The public and the Class are subject to ongoing harm because the unlawful and/or unfair business practices associated with the SimpliSafe Subscriptions are still used by Defendant today.

100.     Plaintiff and the Class seek restitution pursuant to Cal. Bus. & Prof. Code § 17203 of all amounts that Defendant charged or caused to be charged to Plaintiff's and the Class's Payment Methods in connection with their SimpliSafe Subscriptions during the four years preceding the filing of this Complaint.  Defendant should be required to disgorge all the profits and gains it has reaped and restore such profits and gains to Plaintiff and the Class, from whom they were unlawfully taken.

101.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and members of the Class seek a court order enjoining Defendant from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

102.     Plaintiff brings this action as private attorney general and to vindicate and enforce an important right affecting the public interest.  Plaintiff and the Class are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## COUNT II
### Conversion

103.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

104.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

105.     As a result of charges made by Defendant to Plaintiff's and Class members' Payment Methods without authorization and in violation of California law, Defendant has taken money that belongs to Plaintiff and the Class.

106.     The amount of money wrongfully taken by Defendant is capable of identification.

107.     Defendant engaged in this conduct knowingly, willfully, and with oppression, fraud, and/or malice within the meaning of Cal. Civil Code § 3294(c).

108.     As a result of Defendant's actions, Plaintiff and the Class have suffered damages.

### COUNT III
### Violations of California's False Advertising Law ("FAL"),
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

109.     Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as though alleged in this Count.

110.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

111.     California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state,  …in any advertising device … or in any other manner or means whatever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

112.     Defendant committed acts of false advertising, as defined by § 17500, by intentionally making and disseminating statements to consumers in California and the general

1   public concerning Defendant's products and services, as well as circumstances and facts connected

2   to such products and services, which are untrue and misleading on their face and by omission, and

3   which are known (or which by the exercise of reasonable care should be known) by Defendant to

4   be untrue or misleading.  Defendant has also intentionally made or disseminated such untrue or

5   misleading statements and material omissions to consumers in California and to the public as part

6   of a plan or scheme with intent not to sell those services as advertised.

7           113.    Defendant's statements include but are not limited to representations and omissions

8   made to consumers before and after enrollment in Defendant's SimpliSafe Subscriptions regarding

9   the terms of payment for and cancellation of a consumer's automatic payments.  Defendant is silent

10  with regard to the terms of its cancellation policy.  These omissions on the Checkout Page and the

11  Acknowledgment Email constitute false and deceptive advertisements.

12          114.    Defendant's actions in violation of § 17500, as described herein, were false and

13  misleading such that the general public is and was likely to be deceived.

14          115.    Plaintiff and the members of the Class were deceived by Defendant's statements and

15  omissions made online when they signed up and started paying for their SimpliSafe Subscriptions,

16  and there is a strong probability that other California consumers and members of the public were

17  also or are likely to be deceived as well.  Any reasonable consumer would be misled by

18  Defendant's false and misleading statements and material omissions.  Plaintiff and other members

19  of the Class did not learn of Defendant's cancellation and automatic payment policies until after

20  they had already signed up and started paying for Defendant's SimpliSafe Subscriptions.  They

21  relied on Defendant's statements and omissions to their detriment.

22          116.    Plaintiff and the Class lost money or property as a result of Defendant's FAL

23  violations because they would not have purchased the SimpliSafe Subscriptions on the same terms

24  if the true facts were known about the product and the SimpliSafe Subscriptions do not have the

25  characteristics as promised by Defendant.

26          117.    Plaintiff, individually and on behalf of all similarly situated California consumers,

27  seeks individual, representative, and public injunctive relief and any other necessary orders or

28  judgments that will prevent Defendant from continuing with its false and deceptive advertisements

1   and omissions; restitution that will restore the full amount of their money or property;

2   disgorgement of Defendant's relevant profits and proceeds; and an award of costs and reasonable

3   attorneys' fees.

### COUNT IV
**Violations of California's Consumers Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code §§ 1750, *et seq.***

6   118.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the

7   preceding paragraphs as though alleged in this Count.

8   119.    Plaintiff brings this claim individually and on behalf of the members of the

9   proposed Class against Defendant.

10  120.    Plaintiff and the members of the Class are "consumers" within the meaning of Cal.

11  Civil Code § 1761(d) in that Plaintiff and the Class sought or acquired Defendant's goods and/or

12  services for personal, family, or household purposes.

13  121.    Defendant's selection and/or subscription offers and the other products pertaining

14  thereto are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b).

15  The purchases by Plaintiff and the Class are "transactions" within the meaning of Cal. Civil Code §

16  1761(e).

17  122.    The acts and practices of Defendant as described above were intended to deceive

18  Plaintiff and the Class as described herein, and have resulted, and will result, in damages to

19  Plaintiff and the Class.  These actions violated, and continue to violate, the CLRA in at least the

20  following respects: (a) Defendant's acts and practices constitute representations or omissions

21  deceiving that the SimpliSafe Subscriptions have characteristics, uses, and/or benefits, which they

22  do not, in violation of Cal. Civil Code §1770(a)(5); and (b) Defendant's acts and practices

23  constitute the advertisement of the goods in question without the intent to sell them as advertised,

24  in violation of Cal. Civil Code § 1770(a)(9).

25  123.    Plaintiff and the Class suffered economic injury as a direct result of Defendant's

26  misrepresentations and/or omissions because they were induced to purchase SimpliSafe

27  Subscriptions and/or pay renewal fees they would not have otherwise purchased and/or paid.  Had

28  Defendant fully and clearly disclosed the terms associated with the SimpliSafe Subscriptions,

1    Plaintiff and the Class would have not subscribed to the SimpliSafe Subscriptions, or they would

2    have cancelled their SimpliSafe Subscriptions earlier, *i.e.*, prior to the expiration of the initial

3    subscription period or any subsequent renewal term.

4        124.    Plaintiff, on behalf of himself and all other members the Class, seeks an injunction

5    prohibiting Defendant from continuing its unlawful practices in violation of the CLRA.

6        125.    In compliance with the provisions of California Civil Code § 1782, Plaintiff sent

7    written notice to Defendant on March 8, 2023, informing Defendant of his intention to seek

8    damages under California Civil Code § 1750.  The letter was sent via certified mail, return receipt

9    requested, advising Defendant that it was in violation of the CLRA and demanding that it cease and

10   desist from such violations and make full restitution by refunding the monies received therefrom.

11   The letter expressly stated that it was sent on behalf of Plaintiff and "all other persons similarly

12   situated."  Accordingly, if Defendant fails to take corrective action within 30 days of receipt of the

13   demand letter, Plaintiff will amend his complaint to include a request for damages as permitted by

14   Civil Code § 1782(d) for Defendant's violations of the CLRA.

## <u>COUNT V</u>
### Unjust Enrichment / Restitution

16       126.    Plaintiff re-alleges and incorporates by reference every allegation set forth in the
17   preceding paragraphs as though alleged in this Count.

18       127.    Plaintiff brings this claim individually and on behalf of the members of the
19   proposed Class against Defendant.

20       128.    Plaintiff and the Class conferred benefits on Defendant by purchasing the
21   SimpliSafe Subscriptions.

22       129.    Defendant has been unjustly enriched in retaining the revenues derived from

23   Plaintiff and the Class's purchases of the SimpliSafe Subscriptions.  Retention of those moneys

24   under these circumstances is unjust and inequitable because Defendant's failure to disclose

25   material terms of the purchase agreement, in violation of California law, induced Plaintiff and the

26   Class to purchase the SimpliSafe Subscriptions.  These omissions caused injuries to Plaintiff and

27   the Class because they would not have purchased the SimpliSafe Subscriptions at all, or on the

28

same terms, if the true facts were known.

130.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and the Class is unjust and inequitable, Defendant must pay restitution to Plaintiff and the Class for their unjust enrichment, as ordered by the Court.

**COUNT VI**
**Negligent Misrepresentation**

131.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

132.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

133.    As discussed above, Defendant omitted, failed to disclose, and intentionally concealed from its advertisements and related statements regarding the Subscriptions material facts concerning billing, cancellation, and automatic payment terms, policies, and requirements.

134.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

135.    At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the SimpliSafe Subscriptions and their associated terms.

136.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase and enroll in Defendant's SimpliSafe Subscription programs.

137.    Plaintiff and Class members would not have purchased the SimpliSafe Subscriptions if the true facts had been known.

138.    The negligent actions of Defendant caused damage to Plaintiff and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VII
**Fraud**

139.    Plaintiff hereby re-alleges and incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

140.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

141.    As discussed above, Defendant provided Plaintiff and Class members with false or misleading material information and failed to disclose material facts about the SimpliSafe Subscriptions and their associated automatic renewal terms, including terms regarding Defendant's cancellation policy and billing practices and policies.  These misrepresentations and omissions were made by Defendant with knowledge of their falsehood.

142.    The misrepresentations and omissions made by Defendant, upon which Plaintiff and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiff and Class members to purchase the SimpliSafe Subscriptions.

143.    The fraudulent actions of Defendant caused damage to Plaintiff and the members of the Class, who are entitled to damages and other legal and equitable relief as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Krikorian, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order certifying the Class and naming Plaintiff as a representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class;

b.    For an order declaring Defendant's conduct violates the statutes referenced herein;

c.    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

d.    For actual, compensatory, statutory, and/or punitive damages in amounts to be determined by the Court and/or jury;

e.    For prejudgment interest on all amounts awarded;

f.    For an order of restitution and all other forms of equitable monetary relief;

g.    For injunctive relief as pleaded or as the Court may deem proper; and

h.    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated: March 8, 2023                    Respectfully submitted,

                                        By: _/s/ Neal J. Deckant_
                                            Neal J. Deckant

                                        **BURSOR & FISHER, P.A.**
                                        Neal J. Deckant (State Bar No. 322946)
                                        Julia K. Venditti (State Bar No. 332688)
                                        1990 North California Blvd., Suite 940
                                        Walnut Creek, CA 94596
                                        Telephone: (925) 300-4455
                                        Facsimile:  (925) 407-2700
                                        Email: ndeckant@bursor.com
                                            jvenditti@bursor.com

                                        **BURSOR & FISHER, P.A.**
                                        Frederick J. Klorczyk III (State Bar No. 320783)
                                        888 Seventh Avenue
                                        New York, NY 10019
                                        Telephone: (646) 837-7150
                                        Facsimile: (212) 989-9163
                                        Email: fklorczyk@bursor.com

                                        *Attorneys for Plaintiff and the Putative Class*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Neal J. Deckant, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a Partner at Bursor & Fisher, P.A., counsel of record for Plaintiff Gregory Krikorian in this action.  Plaintiff alleges that she is a citizen of California who resides in Auburn, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California, this 8th day of March, 2023.


_/s/ Neal J. Deckant_
Neal J. Deckant